UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                    :

PARTS AUTHORITY, LLC                     :

                                Plaintiff,        :

                                               :        **No. 23-cv-07656 (SDE)**

     -against-                                   :

DANIEL BEYDA,                     :

                                 Defendant.    :

-----------------------------------------------------------------x

## PRE-TRIAL MEMORANDUM OF
## PLAINTIFF PARTS AUTHORITY, LLC

**KANE KESSLER, P.C.**
600 Third Avenue
New York, New York 10016
(212) 541-6222

*Attorneys for Plaintiff Parts Authority, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... *iii*

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 5

A.  KEY PROVISIONS OF THE APA .................................................................... 6

    1.  The Acquired Assets ............................................................................. 6

    2.  Consideration ....................................................................................... 6

    3.  Post-Closing Reconciliations and Holdback Payments ....................... 7

    4.  Potential Export Business Sales Payment ............................................ 8

    5.  Return of Funds Belonging to Parts Authority .................................... 8

B.  BEYDA'S EMPLOYMENT AGREEMENT AND PRIMARY
RESPONSIBILITIES AS A PARTS AUTHORITY EMPLOYEE ................................. 9

    1.  Scope of Beyda's Responsibilities. ...................................................... 9

    2.  Restrictive Covenants. ......................................................................... 10

    3.  Termination Provisions. ....................................................................... 10

    4.  Beyda's Responsibilities. ..................................................................... 11

C.  PARTS AUTHORITY TERMINATES BEYDA'S EMPLOYMENT ........................... 12

D.  BEYDA ARRIVES AT THE OFFICE AND REFUSES TO LEAVE WITHOUT
HIS "PERSONAL LAPTOP" ...................................................................................... 14

E.  PARTS AUTHORITY'S JUNE 2023 NOTICE THAT BEYDA'S
TERMINATION WAS FOR "CAUSE" DUE TO BREACH OF SECTION 7(H)
OF THE EMPLOYMENT AGREEMENT .................................................................... 16

F.  THE NEW YORK STATE COURTS' RULINGS BY CLEAR AND
CONVINCING EVIDENCE THAT BEYDA INTENTIONALLY DELETED
EVIDENCE .................................................................................................................. 17

G.  PARTS AUTHORITY'S JANUARY 2024 NOTICE THAT BEYDA'S
TERMINATION WAS FOR "CAUSE" DUE TO MISAPPROPRIATION OF
$712,323 IN CUSTOMER FUNDS FOR PERSONAL USE ......................................... 18

H.      PARTS AUTHORITY LEARNS THAT BEYDA SURREPTITIOUSLY HIRED JULIEANA HALLS-BURNETTE WHO WAS TRACKING THE VERY CUSTOMER PAYMENTS AT ISSUE HERE ................................................................. 19

I.      PARTS AUTHORITY LEARNS THAT BEYDA RETAINED AN ADDITIONAL $87,250 IN CUSTOMER FUNDS THAT HE STILL HAD NOT REMITTED TO PARTS AUTHORITY ........................................................................ 21

ARGUMENT ...................................................................................................... 23

I.      BURDEN OF PROOF .................................................................................. 23

II.     ADVERSE INFERENCE AGAINST BEYDA IS APPROPRIATE .............................. 24

III.    BEYDA BREACHED HIS EMPLOYMENT AGREEMENT WITH PARTS AUTHORITY ................................................................................................ 25

IV.     BEYDA WAS A FAITHLESS SERVANT .................................................... 28

V.      PARTS AUTHORITY IS ENTITLED TO PUNITIVE DAMAGES ............................ 31

## TABLE OF AUTHORITIES

Page(s)

*4 KZ Inc. v. DimashAli Creative Center, LLP,*
  No. 2:24-cv-01249-ST, 2025 WL 2696539 (E.D.N.Y. Sept. 22, 2025) .................................. 32

*AU New Haven, LLC v. YKK Corp.,*
  No. 15-CV-3411 (GHW)(SN), 2019 WL 1254763 (S.D.N.Y., Mar. 19, 2019) ....................... 2

*Coney Island Auto Holdings Corp. v. Parts Authority, LLC,*
  231 A.D.3d 470 (1st Dep't 2024).................................................................................... 17

*Consol. Edison Co. v. Zebler,*
  No. 603678/09, 2013 WL 4467291 (N.Y. Sup. Ct. Aug. 20, 2013) ....................................... 31

*Drip Capital, Inc. v. JY Imports of NY Inc.,*
  348 F.R.D. 536 (E.D.N.Y. 2025) ...................................................................................... 25

*In re Methyl Tertiary Butyl Ether ("MBTE") Prods*. Liab. Lit.,
  725 F.3d 65 (2d Cir. 2013)................................................................................................ 31

*M.O.C.H.A. Society, Inc. v. City of Buffalo,*
  689 F.3d 263 (2d Cir. 2012)............................................................................................. 24

*Mahn v. Major, Lindsey, & Africa, LLC,*
  159 A.D.3d 546 (1st Dep't 2018)...................................................................................... 29

*Morgan Stanley v. Skowron,*
  989 F.Supp.2d 356 (S.D.N.Y. 2013)................................................................................. 29

*Nature's Plus Nordic A/S v. Natural Organics, Inc.,*
  108 F.Supp.3d 52 (E.D.N.Y. 2015)................................................................................... 27

*O'Neill v. Yield House Inc.,*
  892 F. Supp. 76 (S.D.N.Y. 1995)...................................................................................... 31

*Phansalkar v. Andersen Weinroth & Co., L.P.,*
  344 F.3d 184 (2d Cir. 2003).............................................................................................. 30

*Roytlender v. D. Malek Realty, LLC,*
  No. 21-CV-00052 (JMW), 2024 WL 3566998 (E.D.N.Y. July 29, 2024)........................ 28, 29

iii

*Salus Capital Partners, LLC v. Moser*,
    289 F.Supp.3d 468 (S.D.N.Y. 2018) ....................................................................... 30

*Singapore Recycle Ctr. Pte Ltd. v. Kad Int'l Mktg., Inc.*,
    No. 06-CV-4997 (RRM) (RER), 2009 WL 2424333 (E.D.N.Y. Aug. 6, 2009) ...................... 32

*Synergy Gas Co. v. Sasso*,
    853 F.2d 59 (2d Cir. 1988) ...................................................................................... 30

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ............................................................................. 17

## PRELIMINARY STATEMENT

Plaintiff Parts Authority, LLC ("Parts Authority") respectfully submits this Pre-Trial Memorandum pursuant to the Court's Pre-Trial Order and Rule X.B.3.

Parts Authority seeks to recover at least $2 million from Beyda caused by his breaches of his Employment Agreement with Parts Authority as well as common law duties, by reason of his failure to return company property, intentionally deleting ESI on his last day of employment, improperly retaining and using customer funds instead of turning them over to Parts Authority and actively concealing his misconduct to thwart Parts Authority from discovering it.

Parts Authority will demonstrate at trial that Beyda, employed by Parts Authority as the "Business Manager – Export Business and Special Accounts" between July 2021 and June 2022, breached his employment agreement and was a faithless servant, who was unjustly enriched and who converted property belonging to Parts Authority.  Parts Authority will also demonstrate that Beyda's conduct was so egregious that punitive damages are appropriate, and that Parts Authority is entitled to its attorneys' fees and costs in uncovering Beyda's misconduct and pursuing this action.

There can be no credible dispute that Beyda breached his Employment Agreement. Beyda admits that he kept $799,573 belonging to Parts Authority, only returning it after being caught by Parts Authority's forensic accounting analysis, despite Beyda's concealment and obfuscation.[1]  Specifically, Parts Authority issued two separate reports by its forensic accountants at FTI Consulting ("FTI"), the first in November 2023, which identified $712,323 converted by Beyda, and the second in March 2026, which identified an additional $87,250 in

---

[1] Beyda paid back $712,323 on December 15, 2023, and $87,250 on July 22, 2026 (*i.e.*, on the eve of this trial).

customer funds deposited by Beyda personally using approximately 100 money orders in small denominations.[2] The fact that it took *two* separate forensic accountants reports for Beyda to finally return the money underscores the lengths and the expense to which Parts Authority had to go to merely recover its property from Beyda.

Beyda's diversion of money was not an isolated incident, but a feature of his pervasively faithless 10-month long employment at Parts Authority. Beyda's own bank account statements show that Beyda maintained a cash cushion of hundreds of thousands of dollars belonging to Parts Authority, which he used to pay for personal expenses (such as multiple car leases, home and boat renovations, credit card payments, and personal income taxes), as well as for business expenses of Coney Island entities controlled by Beyda (such as rents, payroll, professional fees for accountants and lawyers, and trucking and shipping fees for a business that supposedly stopped after Parts Authority's acquisition of Coney Island).

Beyda was the sole person who knew of his misdeeds during the course of his employment, because he was personally responsible for collecting customer payments in his legacy bank accounts and remitting them to Parts Authority, and because only Beyda knew what was actually invoiced to customers on so-called "commercial invoices" maintained locally by Beyda on his desktop computer (while Parts Authority only knew what Beyda and his direct report Jimmy Assis manually recorded in Parts Authority's system of record to correspond to the "commercial invoice").[3]

---

[2] There were 176 blank money orders in which Beyda personally handwrote Coney Island as the payee in July 2021, with 93 of them for $1,000 each and the rest in smaller, round numbers.

[3] "Intent" is not an element of any claim that Parts Authority must prove at trial, and even if it were, Beyda's proffered expert, Sean Tanner, cannot opine on "intent" as an expert (since science has not advanced to "mind reader" levels, *see AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW)(SN), 2019 WL 1254763, at *13

Beyda also was the only person who could initiate wire transfers from the relevant bank accounts to Parts Authority.  And Beyda in fact sent customer funds to Parts Authority on 42 separate occasions and instructed Parts Authority's Vice President of Accounts Receivable, Larry Schneider, how to allocate those funds to customer invoices—he just did not send the other 54 customer payments he received during the 10-month period.

Not only did Beyda take the money from Parts Authority, but he also took concrete steps to conceal his malfeasance.  *First*, as Mr. Schneider will testify, he spent a significant amount of time, effort and energy trying to work with Beyda to resolve open accounts receivables issues for export customers.  Beyda was not forthcoming with the information Mr. Schneider requested, including the specific amounts paid by each customer so that the invoices could be reconciled because Beyda lumped multiple payments together into a single transfer to Parts Authority.

*Second*, Mr. Schneider will testify that when Parts Authority received payments directly from export customers that did not match the invoices entered into Parts Authority's system of record by Beyda,[4] Beyda was not forthcoming with the "commercial invoices" he maintained on his desktop computer and obstructed Parts Authority's efforts to obtain the information from Jimmy Assis, Beyda's direct report.  This triggered an internal loss investigation by Parts Authority between May-June 2022, with which Beyda refused to cooperate.

*Third*, during the internal investigation in June 2022, Beyda intentionally deleted emails and ESI from the very desktop computer that contained the local copies of the "commercial invoices" sought by Parts Authority.  This is a judicially established fact by two separate New

---

(S.D.N.Y., Mar. 19, 2019)), particularly when he is merely reviewing a handful of documents hand-picked for Tanner by Beyda and "interpreting" those documents.  *See* ECF No. 90, Plaintiff's Motion to Preclude Tanner.
[4] Export customers only paid for actual parts delivered, so when the payments received by Parts Authority exceeded the invoices, Parts Authority was concerned that Beyda was shipping more inventory to the Middle East than recorded in Parts Authority's systems.

York State courts—Justice Crane in the New York County Commercial Division and the Appellate Division, First Department—based on clear and convincing evidence marshalled by Parts Authority after it was forced to expend significant time and resources for which it was partially compensated by sanctions of $125,000.  As a result of Beyda's malfeasance, Parts Authority was awarded an adverse inference by the New York State courts against Beyda concerning his credibility, which should be awarded to Parts Authority in this case.

*Fourth*, Beyda's spoliation took place on his last day of employment, June 23, 2022—after his access to Parts Authority's systems was cut off at 3 p.m. on June 22, 2022—when Beyda went to his office at 6 a.m., before anyone else was there, and deleted files from his desktop computer.  And after Parts Authority's personnel arrived and directed Beyda to leave the building only with his personal belongings, Beyda refused to leave without his "laptop" (*i.e.*, the desktop computer at issue) arguing that it contained his personal information.

The only way through the impasse short of calling the police was to enter into a "clean review protocol," pursuant to which the computer was delivered by hand by Beyda himself to Parts Authority's counsel at Paul Weiss, forensically imaged (with a copy of the forensic image provided to Beyda's counsel at K&L Gates), and an entirely separate "clean review team" worked to isolate the "personal" files that Beyda alleged were on the computer.  The clean review process took months to complete, once again at a significant cost and expense to Parts Authority, which conclusively revealed that the vast majority of the files on the computer—including the approximately 70,000 *hard deleted* and forensically recovered files—related to Parts Authority's business and were not personal.

Beyda attempts to blame Parts Authority for his own misconduct based on the flimsy excuse that his former "bookkeeper" Julieana Halls-Burnette ("Halls") was reassigned to a different job at Parts Authority after the Coney Island transaction. Yet, while Ms. Halls was employed at Parts Authority, Beyda hired her on the side in violation of his Employment Agreement to do the very same job she did at Coney Island—to keep and maintain Beyda's books together with Beyda, tracking customer cash payments to Beyda's bank accounts, recording them on ledgers maintained in QuickBooks, providing information to Beyda's accountants for tax preparation, and preparing dozens of checks directed by Beyda to be signed by his son Isaac Beyda for hundreds of thousands of dollars using Parts Authority's cash, all of which was unbeknownst to Parts Authority.

Therefore, the evidence will show that Beyda's conduct was not only egregious in and of itself, but that he took great pains to conceal it and stonewall Parts Authority's efforts to reconcile the discrepancies at every turn. As discussed in greater detail below, Parts Authority is entitled to at least $2 million in damages, plus interest, attorneys' fees, and punitive damages.

## FACTUAL BACKGROUND

Parts Authority is a leading national distributor of aftermarket automotive parts to customers in the United States and abroad. Coney Island was formerly engaged in the same business. Beyda solely controls Coney Island and the other entities through which Coney Island conducted its business. ECF 87-1, JPTO Ex. 1, Stipulated Joint Statement of Facts ("SOF"), ¶¶ 1-5.[5]

---

[5] "JPTO" refers to the parties proposed joint pre-trial order, ECF 87. Unless otherwise defined herein, all terms shall have the same meaning as set forth in the JPTO and exhibits thereto, including the SOF.

5

On July 8, 2021, Parts Authority acquired virtually all assets and assumed certain liabilities of Coney Island pursuant to the APA.  Parts Authority and Beyda also executed an Employment Agreement and a number of other agreements ancillary to the closing and to Beyda's employment.  ECF 87-1, SOF ¶¶ 6-7.  On July 9, 2021, Parts Authority began to operate Coney Island's legacy business of selling after-market auto parts to domestic and export customers.  Until his termination on June 23, 2022, Beyda personally operated and managed the newly acquired export business operating out of the Avenel, New Jersey location.

## A.    Key Provisions of the APA

### 1.    The Acquired Assets

Parts Authority acquired all assets of Coney Island, except for those that were explicitly excluded.  Pursuant to Section 2.1 of the APA, "Purchase and Sale of the Purchased Assets," Parts Authority acquired Coney Island's notes and accounts receivable inventory, equipment and computer hardware, intellectual property and email addresses, all books, records, files, invoices, correspondence, financial and accounting records, and "any other assets used by [Coney Island or Beyda] in connection with the operation of the Business."  APA §§ 2.1(a), (b), (d), (e), (f), (k) and (m).  In addition, Coney Island delivered Schedule 2.2(g), which purported to list all of Coney Island's assets that were excluded from the acquisition by Parts Authority and that remained with Coney Island post-closing.  APA § 2.2, "Excluded Assets"; Schedule 2.2(g).

### 2.    Consideration

Pursuant to Section 2.5 of the APA, in exchange for the Purchased Assets, Parts Authority agreed to pay up to $37 million cash to Coney Island, consisting of:  (i) $24 million paid at closing; (ii) up to $6 million in "holdback" amounts to be paid after post-closing

adjustments and reconciliations to Net Working Capital and accounts receivables acquired by Parts Authority pursuant to Section 2.6 of the APA; (iii) up to $5 million of Earn-Out Payments based on annual sales targets for the Earnout Business, payable in annual installments for three years after the closing pursuant to Section 2.7 of the APA; and (iv) up to $2 million of Export Sales Payments based on sales generated by the Export Business that Beyda would continue to manage for Parts Authority after the closing pursuant to Section 2.8 of the APA.  APA § 2.5.

       3.      <u>Post-Closing Reconciliations and Holdback Payments</u>

Section 2.6 of the APA, "Payment of the Hold Back Amount," set forth the process by which Parts Authority would make additional payments of up to $6 million held back at closing from the Purchase Price.

The first half of the Holdback Amount, $3 million, was payable in accordance with Sections 2.6(a) through (e) of the APA.  The second half of the Holdback Amount, also $3 million, was payable in April 2022, subject to calculation of how many of the accounts receivables acquired by Parts Authority remained uncollected 270 days after closing.  The second potential holdback payment also was subject to potential offset by amounts *Coney Island* owed to Parts Authority after the Net Working Capital reconciliation described above.

Beyda refused to engage in the reconciliation process in good faith, or to otherwise comply with the dispute resolution mechanism set forth in the APA, and initiated an action against Parts Authority demanding $15.9 million under the APA.  On the eve of trial, Beyda dismissed with prejudice his claims for $5 million earnout payments under Section 2.7 of the APA, and for $2 million sales commissions under Section 2.8 of the APA.  After a bench trial,

the New York Supreme Court ruled that Parts Authority was required to pay the second holdback amount of $3 million.[6]

4.      Potential Export Business Sales Payment

As part of the overall consideration for the transaction, Parts Authority agreed to pay a maximum of $2 million, based on a commission to Beyda of 2% of Net Sales generated exclusively by Export Business customers each calendar month for 48 months from August 1, 2021, through July 31, 2025.  APA § 2.8(a).  The Export Business consisted mostly of Middle Eastern export customers, and were acquired by Parts Authority as part of the acquisition with Coney Island.

However, a termination of Beyda's employment for cause resulted in forfeiture of any post-termination Export Business Sales Payments.  APA § 2.8(b).  It is hardly surprising that after Beyda was sanctioned for spoliation and was caught with Parts Authority's customer funds in his bank accounts, on the eve of trial in the New York Action Beyda eventually dismissed his claim to be paid the full $2 million sales commission, with prejudice.

5.      Return of Funds Belonging to Parts Authority

Section 5.10 of the APA required both Coney Island and Beyda, as Shareholder, to segregate, and thereafter promptly remit to Parts Authority any funds received after the closing belonging to Parts Authority, *with interest*.  APA § 5.10.

---

[6] *Coney Island Auto Holdings Corp. v. Parts Authority, LLC*, Index No. 656816/2022 (the "New York Action"). The court in the New York Action also held that Beyda was not entitled to the $8.5 million he sought, calling Beyda's position "greed."  Parts Authority is appealing that decision and subsequent judgment to the Appellate Division, First Department, on the grounds that, *inter alia*, the trial court misinterpreted an ambiguous contract provision without considering extrinsic evidence and erroneously granted attorneys' fees to Coney Island.

**B.    Beyda's Employment Agreement and Primary Responsibilities as a Parts Authority Employee**

Pursuant to the Employment Agreement, Beyda became employed by Parts Authority with the title of "Business Manager," charged with managing Parts Authority's Export Business. Beyda was to receive a base annual salary of $200,000, plus certain benefits, reimbursement of expenses and an annual bonus.

1.    <u>Scope of Beyda's Responsibilities.</u>

Beyda agreed to "devote his full-time, attention and best efforts to the performance of his duties hereunder," and to "at all times comply with and be subject to [Parts Authority's] employment and other policies in effect from time to time and applicable to its employees." Employment Agreement § 2(b).  This included Parts Authority's policies and procedures governing the return of documents and confidential information upon termination of employment, and workplace behavior policies set forth in Parts Authority's employee handbook.

Beyda also agreed that upon his termination, he would "immediately deliver to Parts Authority: (i) all property of [Parts Authority] or any of its affiliates then in [Beyda's] possession; and (ii) all documents and data of any nature and in whatever medium of [Parts Authority] or any of its affiliates, and [Beyda] will not take with [him] any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any Confidential Information."  Employment Agreement § 7(h).  Indeed, as part of his onboarding as a Parts Authority employee, Beyda separately received, read and acknowledged that he is bound by the applicable policies and procedures in that regard.

2.      Restrictive Covenants.

In addition, the Employment Agreement required Beyda to comply with various restrictive covenants: Section 7(a) required Beyda to protect Confidential Information belonging to Parts Authority; Section 7(b), "Non-Competition," prohibited Beyda from "directly or indirectly, engag[ing] in or carry[ing] on the Restricted Business in the Restricted Territory" during the Restricted Period; Section 7(c), "Non-Interference," prohibited Beyda from soliciting in any way past customers of either Parts Authority or Coney Island and interfering with Parts Authority's business; Section 7(d), "Non-Solicitation; Non-Hire," prohibited Beyda from soliciting or hiring any Parts Authority employee; Section 7(e), "No Financing of a Competing Business," prohibited Beyda from lending money or participating in a financing of a competing business; and Section 7(g), "Non-Disparagement," prohibited Beyda from directly or indirectly disparaging or criticizing Parts Authority and its personnel.

3.      Termination Provisions.

Section 6(b) of the Employment Agreement governed termination of Beyda's employment by Parts Authority providing, in part, that Parts Authority may terminate Beyda's employment "at any time, for any reason and for no reason and with or without cause. "'Cause' shall mean, *inter alia*: (i) [Beyda] engaging in fraud, willful misconduct or dishonesty, including action or inaction, in connection with services rendered to [Parts Authority] or that has caused or is reasonably likely to cause, material damage to [Parts Authority] or any of its affiliates or their respective businesses or reputations….; (iii) any material breach by [Beyda] of any of his obligations under Section 7 hereof…." Thus, Parts Authority could terminate Beyda for Cause under Section 6(b) of the Employment Agreement either if he misappropriated funds or

otherwise harmed Parts Authority, or if he failed to return property to Parts Authority after his termination for any reason.

4.    Beyda's Responsibilities.

Beyda's primary responsibility during his employment by Parts Authority was to manage the ongoing operation of Parts Authority's export business (whose performance as measured by Net Sales directly impacted Beyda's potential post-closing earnout and sales commission payments under the APA). Accordingly, Parts Authority provided highly sensitive internal pricing and margin information to Beyda, after first requiring Beyda to execute additional non-disclosure agreements.

Following the closing, Beyda operated and managed the export business in essentially the same manner he had before the closing of the APA. Specifically, Beyda and his direct report, Jimmy Assis, continued to invoice, ship, and receive payment on behalf of Parts Authority.

Between the closing in July 2021 and January 2022, invoices related to Parts Authority's Export Business were sent under the Coney Island-legacy name. This also meant that payment for such invoices was remitted directly to Coney Islands' legacy bank accounts at PNC Bank ("PNC") and Metropolitan Commercial Bank ("MCB"), which were controlled solely by Beyda. As Randy Buller will testify, this was partly unavoidable because shipments of products to customers in the Middle East were already in progress as of the closing—some were actually on the ships in the middle of the Atlantic, some were in containers waiting to be loaded onto ships, and some were on palettes in the warehouse ready to be shipped—and each such shipment was already documented for export and invoiced for payment upon receipt of the goods. And more importantly, Beyda agreed to this procedure—and the APA expressly contemplated that if any

11

money was received by Coney Island that belonged to Parts Authority, it would be segregated and remitted "promptly" to Parts Authority.

After this initial period of transition, beginning in January 2022, invoices related to the Export Business were sent under Parts Authority's name, and Parts Authority began receiving payments directly into its account at Bank of America ("BofA").  Nevertheless, even after January 2022, some customer payments continued to be remitted to Coney Island's legacy MCB account controlled by Beyda—because some customers may have paid invoices generated prior to January 2022 that directed them to do so, or because of potential miscommunications or misunderstandings.

At all times during his employment, Beyda was required to remit to Parts Authority all customer payments made to either PNC or MCB accounts, and to work with Larry Schneider at Parts Authority to track the activity for such export customers.[7]  Beyda made 42 separate transfers of customer cash under this arrangement, with instructions to Mr. Schneider on how to allocate the payments to different customers and different invoices—*except* for $799,573, which he retained for his own coffers unbeknownst to Parts Authority.

## C.    Parts Authority Terminates Beyda's Employment

In June 2022, Beyda's continued employment at Parts Authority became untenable.

Over the course of his employment, Beyda repeatedly violated Parts Authority policies and procedures, triggering a human resources investigation in December 2021, and a suspension in February 2022.  As memorialized by Randy Buller, a partial list of issues leading to Beyda's suspension included "severe problems" getting along with senior management of Parts

---

[7] The domestic customers of Coney Island were onboarded much more quickly, such that invoicing and collection of payments was handled by a separate team at Parts Authority ultimately reporting to Mr. Schneider.

Authority, "off the charts bullying tactics and disparaging remarks," and refusals to share information about the operations, inventories and customer remittances of cash for the Export Business with Parts Authority teammates.  In short, Beyda operated the Export Business as if he continued to own Coney Island and not as a Parts Authority employee—even saying that "I work for myself not Parts Authority."

Other disputes arose during this time concerning Beyda's demands for Holdback Amounts under the APA, which required Beyda's cooperation in reconciling accounts receivable, accounts payable and inventory acquired by Parts Authority—but which Beyda obstructed and frustrated with his refusals to share information.  These disputes were exacerbated when in May 2022, Parts Authority received payments from Export Business customers that did not match the invoices recorded by Beyda on Parts Authority's systems of record.  Specifically, it appeared that Beyda received payments from customers in amounts greater than those he recorded, raising serious concerns that Parts Authority lacked accurate information about its inventories and cashflows, and, even more importantly, could lead to unwarranted disputes with customers and loss of business.

Accordingly, Parts Authority first attempted to reconcile these direct customer payments with the "commercial invoices" prepared and maintained by Beyda locally on his desktop computer at his office, and then on or about June 3, 2022, Parts Authority informed Beyda that it was initiating an investigation into the matter.  Beyda refused to cooperate with the investigation, failed to provide information necessary to determine the nature, extent and reasons for the referenced discrepancies, and instructed his direct report, Jimmy Assis, not to respond to inquiries from Parts Authority's management without checking with Beyda first.

13

In the middle of the internal investigation, Beyda caused his counsel to issue to Parts Authority a baseless Notice of Default and pre-litigation demand on June 7, 2022, and on June 15, 2022, Coney Island sued Parts Authority in the New York Action.

By letter dated and sent on June 22, 2022, Parts Authority notified Beyda of his termination pursuant to Sections 6(b) and 6(d) of the Employment Agreement, advising that his last day of employment would be June 23, 2022.  In its letter, Parts Authority reminded Beyda of his continuing post-employment obligations pursuant to his Employment Agreement and a separate Restrictive Covenant Agreement.  Parts Authority also expressly reserved all rights to terminate Beyda for Cause pending the outcome of its investigation:

> As you know, the Company is continuing to investigate events that occurred during the Employment Period.  The Company hereby reserves any and all rights, claims and recourses it may have against you, whether arising by or in contract, law, equity or otherwise, including the right to inform you that your termination was with Cause under the Employment Agreement if the Company's investigation demonstrates that a termination for Cause was appropriate.

Notwithstanding his termination, in June and July 2022, Parts Authority made two separate payments to Beyda pursuant to Section 2.8 of the APA, for approximately $535,290 of sales commissions based on Net Sales through April 30, 2022, and an additional $81,296 sales commissions through May 31, 2022, Beyda's last full month of employment at Parts Authority.  Thus, Beyda was paid approximately $616,000 in sales commissions earned during his employment with Parts Authority pursuant to Section 2.8 of the APA.

**D.    Beyda Arrives at the Office and Refuses to Leave Without His "Personal Laptop"**

At approximately 3 p.m. on June 22, 2022, Parts Authority cut off Beyda's access to Parts Authority's email, servers, and pricing, purchasing and invoicing systems to prevent Beyda

from deleting or misappropriating any confidential business information belonging to Parts Authority.  However, Beyda continued to have access to Coney Island's systems and network, and his legacy Coney Island email "danny@ciapgroup.com," over which Parts Authority had no control—and which Beyda used to operate Parts Authority's Export and Earnout Business despite repeated instructions that he should use his Parts Authority email to communicate with vendors, salespersons, and customers.

On June 23, 2022, his last day of employment at Parts Authority, Beyda arrived at his office at approximately 6:00 a.m. under the guise of collecting his "personal" belongings.  With no one else present at the office, Beyda accessed his Parts Authority computer until approximately 7 a.m., when Parts Authority personnel learned that Beyda was in his office and sent employees to supervise Beyda's collection of his personal items.

At that point, Beyda refused to leave Parts Authority's premises without taking the computer with him—insisting it was his "personal laptop" (even though it was a desktop and belonged to Parts Authority pursuant to the express provisions of the APA), and asserting, falsely, that it contained solely his personal files and information.  Parts Authority rejected Beyda's attempt to take Parts Authority's property (and the data contained on the computer), and the parties were at an impasse.

Rather than calling the local police department to eject Beyda from its premises and further escalating the issue, Parts Authority agreed to a "clean review protocol" through which the parties' counsel were to quickly classify the files on the computer as either "work" or "personal," and thereafter release the computer and the "work" files to Parts Authority, without

15

the "personal" files (which were to be released to Beyda).[8]  Immediately after the "clean review protocol" was agreed on June 23, 2022, Beyda drove to Manhattan and hand-delivered the computer to Paul Weiss, Parts Authority's counsel at that time, and the clean review protocol began.

Regrettably, but consistent with his past behavior, Beyda abused the "clean review" process such that Parts Authority and litigation counsel did not gain access to the computer until over a year later in May 2023—and even later for forensically recovered emails and files which had to be put through the "clean review" protocol and were not made available to Parts Authority until September-October 2023 (and only after the New York court ordered Beyda to complete the clean review protocol).

**E.    Parts Authority's June 2023 Notice that Beyda's Termination was for "Cause" due to Breach of Section 7(h) of the Employment Agreement**

On June 19, 2023, promptly after a forensic computer analysis by Daniel Conners of DISCO, Parts Authority notified Beyda that his termination of employment with Parts Authority as of June 23, 2022, was "for Cause" pursuant to Sections 6(b) and 6(d) of the Employment Agreement because of his intentional destruction of company data.  Parts Authority further informed Beyda that his misconduct was particularly egregious and dishonest in light of the contemporaneous circumstances surrounding the deletion of data:

> These include (i) a pending investigation and inquiries by Parts Authority into your accounting, invoicing, inventory, and payment practices, including whether you improperly diverted or otherwise retained funds belonging to Parts Authority; (ii) a lawsuit you initiated on June 15, 2022, against Parts Authority by Coney Island Auto Holdings Corp. seeking millions of dollars in payments to which you are not entitled; and (iii) your

---

[8] The "clean review protocol" prohibited anyone at Parts Authority or its counsel—including litigation counsel in the New York Action—from accessing any file or document until Beyda agreed that the document was "work related."

attempt to remove the Computer from Parts Authority's premises in the early morning of June 23, 2022, under the pretense that it was your "personal laptop"—and your subsequent "agreement" to release the Computer to perform a "review protocol" which was made under false pretenses, because you had already scrubbed and "hard deleted" 70% of the ESI on the Computer.

Finally, Parts Authority reiterated its reservation of rights in light of its still-ongoing investigation of the events that occurred during Beyda's employment with Parts Authority, and expressly reserved the right to assert additional bases for terminating Beyda's employment with Parts Authority with cause.

**F.    The New York State Courts' Rulings by Clear and Convincing Evidence that Beyda Intentionally Deleted Evidence**

On September 22, 2023, Parts Authority moved for spoliation sanctions, an adverse inference and attorneys' fees in the New York Action.  In a Decision and Order dated December 7, 2023, following full briefing, oral argument and an evidentiary hearing where both parties' forensic computer experts gave testimony, the court ruled that Beyda "spoliated evidence on purpose," and awarded an adverse inference regarding Beyda's credibility, and monetary sanctions to Parts Authority.  The court's findings of facts in its decision and on the record at the December 7, 2023, evidentiary hearing are now judicially established facts.

After Beyda appealed to the Appellate Division, baselessly asserting that Justice Crane abused her discretion, the First Department affirmed the lower court in all respects, including the adverse inference at trial.[9]  *See Coney Island Auto Holdings Corp. v. Parts Authority, LLC*, 231 A.D.3d 470, 470-71 (1st Dep't 2024) (applying *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212

---

[9] While the appeal was pending, the parties compromised and stipulated that Beyda would pay (subject to his appeal) $125,000 of the total attorneys' fees and costs incurred by Parts Authority to perform forensic recovery of the data and to make the sanctions motion, such that further motion practice on the attorneys' fees themselves could be avoided.

(S.D.N.Y. 2003), and concluding that "the [trial] court expressly found that defendant showed by clear and convincing evidence that plaintiff's majority shareholder intentionally deleted emails after June 7, 2022, the date on which he had an obligation to preserve them").

**G.      Parts Authority's January 2024 Notice that Beyda's Termination was for "Cause" due to Misappropriation of $712,323 in Customer Funds for Personal Use**

On November 21, 2023, Parts Authority's forensic accountants at FTI issued a report to demonstrate that based on FTI's analysis of bank account statements for MCB and PNC, there were $712,323 in customer payments that were not remitted to Parts Authority but instead were used for Beyda's personal and other business purposes.  On December 15, 2023, Beyda "returned" the $712,323, claiming that it was a "mistake."  At the same time, Beyda's counsel at K&L Gates cancelled the deposition of Basil Imburgia of FTI, who prepared the November 21, 2023, report, and was scheduled to appear for deposition on December 19, 2023.

In other words, the $712,323 was indisputably and inarguably customer funds belonging to Parts Authority that should have been paid back to Parts Authority in 2021-2022, in the ordinary course of Beyda's operation and management of the export business, and not after Parts Authority "proved" that Beyda had the money by forensic accounting—particularly since customer payments are used by Parts Authority in its ordinary course to pay for business (like inventory) and operational expenses (like salaries and even the lights at the office), and particularly since it would be exceedingly detrimental to Parts Authority's business if customers lost faith in Parts Authority's ability to accurately keep track of invoice payments.

FTI's work required appropriate diligence and quality control processes involved in a duly qualified' expert's report and valid opinions, and cost Parts Authority approximately $71,410.

18

On January 5, 2024, Parts Authority notified Beyda that his improper diversion, retention, use, and failure to remit to Parts Authority at least $712,323 in customer funds belonging to Parts Authority during Beyda's employment period constituted additional bases for Parts Authority to terminate Beyda's employment "for Cause."

### H.    Parts Authority Learns that Beyda Surreptitiously Hired Julieana Halls-Burnette Who Was Tracking the Very Customer Payments at Issue Here

As Parts Authority previously advised this Court during discovery motion practice in March 2025 (*see* ECF 41, March 3, 2025), in early January 2025, Parts Authority learned that Beyda had hired Ms. Halls (a Parts Authority employee since July 9, 2021), to perform accounting/data entry services on QuickBooks with respect to, *inter alia,* the customer funds at issue in this action and on his own behalf.  ECF 41, at 2.  After Parts Authority issued a discovery deficiency letter, Beyda made a supplemental production on February 12, 2025, consisting of 174 emails and certain Excel outputs from Beyda's QuickBooks.[10]  On February 14, 2025, Parts Authority issued a Notice of Default and Cease and Desist Correspondence, notifying Beyda that, among other things, his solicitation and hiring of Ms. Halls was a breach of his restrictive covenants.  On or about March 13, 2025, Parts Authority terminated Ms. Halls from her employment at Parts Authority.

On April 30, 2025, Ms. Halls was deposed in this action, pursuant to a subpoena, and produced additional documents that had not been previously produced by Beyda.  This evidence demonstrates that Ms. Halls in fact worked for Beyda no later than May 2022, and among other things, tracked *all* transfers into Beyda's bank accounts and recorded them in QuickBooks.

---

[10] Parts Authority's efforts to obtain discovery of Beyda's QuickBooks and other document production pursuant to previously-agreed upon search terms continued throughout 2025, virtually until the end of the fact discovery period in November 2025.

Remarkably, Ms. Halls specifically recorded *all customer* transfers into Beyda's bank accounts after July 9, 2021, using QuickBooks account GL 1016, which Beyda's accountants said (correctly) "was the account that was used when customers sent money to the company post sale that was owed to Parts Authority."[11]  Also remarkably, as of January 14, *2024*, that GL 1016 account showed $1,317,920—when Beyda only paid back $712,323 to Parts Authority.

In line with her testimony at the deposition, Ms. Halls is expected to testify at trial that Beyda—and only Beyda—knew exactly where the money was, and how it should be categorized and recorded, if Ms. Halls had any questions.  Indeed, as Ms. Halls previously testified, Coney Island's controller was dismissed from his job by Beyda in early 2021, coincidentally shortly before diligence began on the basis of which Parts Authority signed a letter of intent to acquire Coney Island's business for $37 million, based on a multiple of Coney Island's earnings ("EBITDA").  Thereafter, Beyda, Ms. Halls and Isaac Beyda were the primary sources of information for Parts Authority's financial diligence and closing schedules for the transaction.

Beyda's accountants at Anchin[12] are likewise expected to testify at trial (consistently with Rule 30(b)(6) testimony by Michael Greenfield) that Beyda was a sophisticated businessman, who knew where his money was—and was at least proficient in finding the information needed by Anchin in connection with preparation of Beyda's personal tax returns and multiple Coney

---

[11] Incidentally, Ms. Halls appears to have used GL 1016 as a placeholder account for tracking cash to and from Parts Authority and its customers, taking instructions from Beyda on how to later categorize expenses in response to questions from Beyda's accountants.  For instance, the $73,000 check issued by Isaac Beyda to himself was recorded in GL 1016, and was subject to some discussion between Ms. Halls, Mr. Beyda and the accountants in November *2022*.

[12] Anchin was Beyda's and Coney Island's long-time accountants, beginning in or about 2012.  The last year for which Anchin prepared financial statements was 2019, because in 2021 (*i.e.* for year-end 2020, and coincidentally with the Parts Authority acquisition and "loss" of Coney Island's controller) Beyda decided only to use Anchin for tax return preparation work.  Also coincidentally, the 2020 financial statements and adjustments thereto were the basis on which Parts Authority agreed to pay up to $37 million on July 8, 2021, or 10X Coney Island's adjusted EBITDA.

Island entities, based on complicated trial balances and ledgers maintained by Beyda and provided to Anchin to perform their professional services.

The evidence at trial will also show that Anchin itself relied on Beyda to provide Anchin with information, and reconciliation of accounting entries as needed for tax preparation, between 2020 and 2024 (when the 2020, 2021 and 2022 year tax returns were actually completed). The evidence will also show that Beyda did not disclose to Anchin that he was using the Coney Island corporate accounts to pay for hundreds of thousands of dollars in personal expenses, which Beyda stated Anchin "could not know about." The evidence will also show that when Parts Authority insisted on speaking with Anchin about Beyda's and Coney Island's representations about EBITDA and adjustments thereto, Beyda did not even tell Anchin about it, but Beyda told Parts Authority that he did and that Anchin could not join the call due to concerns about "Anchin exposure."

**I.      Parts Authority Learns that Beyda Retained an Additional $87,250 in Customer Funds that He Still Had Not Remitted to Parts Authority**

Prior to the closing of the APA, on June 28, 2021, Beyda and his son Isaac met with Randy Buller to explain why Parts Authority's diligence could not validate the adjusted EBITDA that Beyda represented Coney Island had. At that meeting, Beyda told Mr. Buller that there was a portion of customer payments that was not reflected in Coney Island's books because a portion of the invoiced amounts was sent to offshore accounts. To demonstrate how this worked, Beyda provided a spreadsheet to Mr. Buller, and a stack of invoices, and then illustrated that for certain invoices a small percentage went "offshore."

Mr. Buller recorded these illustrations on the spreadsheet, on a sample basis, to ensure that he understood Beyda's explanation. Then, Mr. Buller informed Beyda that this practice will

21

not and cannot continue at Parts Authority, but that Mr. Buller was satisfied that an additional $600,000 of earnings should be included in Coney Island's adjusted EBITDA, and that the parties can continue with a $37 million purchase price based on adjusted EBITDA of $3.5 million and 10X multiple applicable at that time.  In other words, to justify $6 million of the $37 million purchase price, Beyda demonstrated to Mr. Buller that there was $600,000 in earnings based on customer payments into offshore accounts.

During the course of discovery in this action, Parts Authority demanded that Beyda produce bank statements from the "offshore" bank accounts that he represented received customer funds prior to the closing on July 8, 2021, lest Beyda continued the side-pocket process while he was employed at Parts Authority (and after he admitted that he owed back $712,323 in export customer funds).  In response, and contrary to his previous representations, Beyda denied that he ever had any offshore bank accounts.  After motion practice on this issue, Judge Scanlon directed Beyda to identify all bank accounts he controlled personally or as a business account, and so-ordered subpoenas to such banks to produce all bank account information to Parts Authority.  None of the banks identified any "offshore" accounts.[13]

PNC Bank was one of these financial institutions who produced documents in response to the judicial subpoena from this Court.  As a result of this production, Parts Authority learned that in July 2021, days after the closing of the transaction with Parts Authority, Beyda hand-wrote and signed 176 individual small-dollar denomination money orders that were issued in blank by a customer (with 93 of them for $1,000 and the rest in smaller round number increments), and

---

[13] Although it appears that New York branches of foreign banks, such as HSBC, would not treat an account based in Hong Kong or Dubai as subject to the subpoena, and would require actual discovery abroad.

deposited them into PNC Bank.  The total amount of these money orders was $165,000, but $87,250 of them were both dated and deposited after July 8, 2021, the date the APA closed.

At his deposition, Beyda testified that these money orders were in fact customer funds, paid by a customer based in Egypt.  And Beyda also testified that this type of "banking" activity by Beyda led PNC Bank in late 2021 to close the bank account used by Beyda to receive export customer cash *after* the closing—*i.e.*, the very funds that Beyda should have but did not turn over to Parts Authority.

Based on this additional evidence, Parts Authority's forensic accountants re-reviewed the financial data (including the numerous additional bank account statements produced), and issued a report on March 27, 2026, concluding that there was an additional $87,250 in customer funds that belong to Parts Authority but used by Beyda for his personal needs instead.  On June 22, 2026, once again after being caught red-handed, Beyda wired the $87,250 into Parts Authority's bank account.[14]

## ARGUMENT

### I.    BURDEN OF PROOF

The appropriate burden of proof in this civil action is preponderance of the evidence, which Parts Authority will more than meet at trial.

*First*, Beyda *admitted* he kept $799,000 in customer funds belonging to Parts Authority for *years* by wiring the funds to Parts Authority on December 15, 2023, and June 22, 2026. *Second*, Beyda's failure to return company property—and indeed intentional deletion of email

---

[14] Beyda also made a motion *in limine* that there were no damages after he repaid this money to Parts Authority, which ignores applicable law and the fact that it took Parts Authority several years and enormous effort and costs to "prove" to Beyda that there was missing money when Beyda could have and should have tracked the cash during his employment, and if not then, certainly after the issue became known to Beyda long before June 22, 2026.

and ESI from this desktop computer is a judicially established fact pursuant to two separate New York State court decisions at the trial and the appellate level.

*Third*, Beyda hired Ms. Halls to continue to work with him *while* she also worked at Parts Authority from at least May 2022 until March 2025.  That Ms. Halls worked on tracking and recording cash transfers and maintaining ledgers and trial balances for Beyda, including records of the very customer cash at issue in this case, only underscores the brazen nature of Beyda's breach of his non-solicitation covenant in his Employment Agreement.

*Finally*, the evidence will demonstrate that Parts Authority was damaged by Beyda's breaches, having lost access for years to $799,573 that should have been used by Parts Authority to operate its business, and having to spend hundreds of thousands of dollars and more to engage forensic accountants and lawyers to recover property that Beyda should have never taken in the first place (because it was his *job* as the manager of the export business at Parts Authority to remit the funds that he diverted for his own use).

## II.    ADVERSE INFERENCE AGAINST BEYDA IS APPROPRIATE

Two separate courts already ruled that based on clear and convincing evidence, Beyda destroyed evidence when he had a duty to preserve it in June 2022, and that an adverse inference against Beyda's credibility is appropriate at trial.  As explained by Parts Authority's motion *in limine* (ECF 93), Beyda is collaterally estopped from arguing otherwise in this action, and an adverse inference against Beyda is equally appropriate at trial here.  *See M.O.C.H.A. Society, Inc. v. City of Buffalo*, 689 F.3d 263, 284 (2d Cir. 2012) ("Collateral estoppel … prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding.") (citations omitted).

24

Beyda's destruction of evidence—what the State courts have called a "massive" amount of data—goes directly to whether he breached his employment agreement with Parts Authority by failing to return all company property upon his termination.  It also relates to Parts Authority's claim that Beyda was a faithless servant throughout his employment at Parts Authority.

Beyda's conduct as an employee—and his efforts to conceal his failure to return $799,000 in customer funds to Parts Authority *prior* to his termination in June 2022—goes to the heart of Parts Authority's claims and, as such, the adverse inference is necessary to level the evidentiary playing field and prevent Beyda from benefiting from his own misconduct.  *See Drip Capital, Inc. v. JY Imports of NY Inc.*, 348 F.R.D. 536, 566 (E.D.N.Y. 2025) (explaining that an adverse inference sanction "ensures fairness while preserving the Defendants' opportunity to present their case at trial.").

### III.    BEYDA BREACHED HIS EMPLOYMENT AGREEMENT WITH PARTS AUTHORITY

No reasonable person could disagree that Beyda failed to comply with his obligations under the Employment Agreement throughout his 10-month employment at Parts Authority, and beyond.  Parts Authority is entitled to judgment on its breach of contract claim if it can show by a preponderance of the evidence a *single* breach by Beyda.  The evidence at trial will demonstrate at least three inarguable breaches.

*First*, it is beyond dispute that Beyda did not turn over to Parts Authority $799,573 in customer funds at any point during his employment—even though it was his *job* and personal responsibility to *manage* the process and invoice, track, collect, and remit such funds to Parts Authority.  Instead, Beyda maintained a cushion of customer cash throughout his entire 10-

month employment period at Parts Authority (and beyond), commingled the funds (instead of segregating them) with his personal and other business funds, and used the funds indiscriminately for hundreds of thousands, if not millions, of dollars' worth of personal expenses ranging from car lease payments to income tax payments.

*Second*, it is a judicially established fact—by two separate New York courts—that there was clear and convincing evidence that Beyda destroyed Parts Authority property by engaging in a massive deletion of ESI, and went as far as going to the office at the crack of dawn on his last day of employment to physically access his work computer and delete the data *after* Parts Authority cut off Beyda's remote access to the system. Nor did Beyda actually "deliver" to Parts Authority (let alone "immediately"), "all property" or "all documents and data" of Parts Authority. Instead, he retained (and continues to retain) Parts Authority files and data on his actual "laptop" computer at home, and he "turned over" a largely scrubbed desktop computer to Parts Authority's counsel subject to a contrived "clean review protocol."

*Third*, while both he and Julie Halls were employed by Parts Authority, Beyda hired Ms. Halls to work for him on *Coney Island* and Beyda's personal bookkeeping tasks, and to track and record the very same customer funds that Beyda diverted for personal use instead of remitting them to Parts Authority.

Contrary to what Beyda appears to believe, he is not absolved from liability by his piecemeal "return" of the $799,573 in customer funds years later (with $87,250 returned on June 22, 2026—the day that motions *in limine* were due before the July 13, 2026, trial). Nor is it a defense that Parts Authority was able to recover the vast majority—but not all—of the intentionally deleted ESI.

26

Beyda caused widespread damage to Parts Authority by his fundamental failure to do his job. For instance, when Parts Authority collects accounts receivables, it uses the funds to buy inventory, pay workers, and even to pay the electric bill to keep the lights on. When Beyda diverted and kept the $799,573 of customer funds for *years* afterwards, Parts Authority did not have those funds to use in its ordinary course of business. The interest on these funds, as calculated by Parts Authority forensic accountant is $126,867 as of March 31, 2026, and Parts Authority deserves to be compensated for loss of use of these funds. *See Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 108 F.Supp.3d 52, 56 (E.D.N.Y. 2015) ("it is black letter New York law that parties that prevail on breach of contract claims are presumptively entitled to collect prejudgment interest in addition to contract damages.") (citation omitted).

Likewise, in order for Beyda to "return" these $799,573, Parts Authority had to go through the burden and expense of a forensic accountant. Indeed, the evidence at trial will show that in August 2023 Beyda denied under oath that he had kept any customer funds belonging to Parts Authority—but readily admitted it and "returned" the $712,323 *after* FTI's November 2023 report and cashflow analysis. Then, in his September 2024 deposition, Beyda denied that he had any other customer funds in his possession, and that he supposedly reviewed his bank account statements to make that determination. Yet, after FTI issued a supplemental report in March 2026, identifying $87,250 in *additional* export customer funds, Beyda "returned" them on June 22, 2026—*21* days before trial.[15] Simply put, Parts Authority Parts Authority spent $135,480

---

[15] Remarkably, these $87,500 were *a portion of over 100 individual money orders* from an export customer, which Beyda personally handwrote and deposited into PNC Bank in July 2021, *after* he became a Parts Authority employee. Equally remarkable, Beyda revealed at his October 2025 deposition that this type of banking activity by Beyda apparently triggered PNC Bank to close Beyda's account due to anti-money laundering concerns.

(and counting) on its forensic accountants, and it is entitled to be compensated by Beyda for those fees and expenses.

Finally, before Parts Authority could even get access to *its own* desktop computer that Beyda used at his *Parts Authority* office, Parts Authority had to jump through the hoop of the "clean review protocol" after Beyda's termination—to which it agreed solely because Beyda was adamant that the computer was his and contained solely his personal information.

This was not true—and the evidence of this includes *tens of thousands of business records*, such as sensitive pricing information and Beyda's communications with other Parts Authority employees and customers, which Beyda intentionally deleted and that Parts Authority forensically recovered. And in order to reconstruct the flow of funds into Beyda's myriad bank accounts to determine exactly how much customer cash Beyda kept and used for himself Parts Authority had to expend the significant costs and expense of obtaining judicial subpoenas from this Court, and motion practice on these and various other financial disclosure issues with Beyda.

Again, Parts Authority deserves an award of these attorneys' fees and costs incurred in the "clean review protocol" and in pursuing this action, with exact amounts to be set after trial pursuant to Rule 54 motion practice—but not less than $1 million.

## IV.    BEYDA WAS A FAITHLESS SERVANT

Parts Authority is also entitled to judgment on its faithless servant claim if it can show by a preponderance of the evidence a *single* breach of Beyda's duty of loyalty to Parts Authority, or that Beyda's misconduct substantially permeated Beyda's employment at Parts Authority.[16]

---

[16] *See Roytlender v. D. Malek Realty, LLC*, No. 21-CV-00052 (JMW), 2024 WL 3566998, at *11-12 (E.D.N.Y. July 29, 2024) ("New York courts have looked to the following standard to determine whether an employee's conduct supports forfeiture under the faithless servant doctrine: (1) That the employee's disloyal activity was related to the

28

The evidence at trial will show persistent and continuous diversion of company funds for Beyda's personal expenses, such as monthly car lease payments for multiple vehicles, monthly American Express payments, and even personal income taxes.  Indeed, what Beyda did—manufacturing a cash cushion using Parts Authority's accounts receivable collected from customers that *averaged* $799,583 during each of Beyda's 10-month employment at Parts Authority—is a textbook example of a faithless servant.  *See, e.g.*, *Roytlender*, 2024 WL 3566998, *11-13 (employee's embezzlement of company funds and tenants' deposits to pay for personal expenses such as rent, car payments, and utilities); *Morgan Stanley v. Skowron*, 989 F.Supp.2d 356, 363 (S.D.N.Y. 2013) (applying faithless servant doctrine to employee's breach of duties arising from insider trading violations); *Matter of Mahn v. Major, Lindsey, & Africa, LLC*, 159 A.D.3d 546 (1st Dep't 2018) (salary and commissions properly clawed back from faithless servant who misappropriated confidential information in return for kickbacks).

It is almost an understatement to call Beyda a faithless servant, given his egregious misconduct and abuse of his position as the *Manager* of the Export Business, with direct responsibility for collecting and remitting to Parts Authority the very funds he diverted for personal use.  When evidence of Beyda's active efforts to prevent discovery of his misconduct and intentional spoliation of evidence is considered, any excuse that Beyda might offer at trial becomes beyond indefensible.

Nor is it believable that Beyda "did the best he could."  Beyda is a successful businessman, who sold his company to Parts Authority for $37 million, and who now operates real estate ventures, a laundromat and a car wash.  Yet, when it came to Parts Authority's export

---

performance of [their] duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part.") (citation omitted).

29

customer cash deposited into his bank accounts, Beyda received 94 transfers over 10 months (*i.e.* an average of 10 per month), but only forwarded 42 payments to Parts Authority—or less than half.  And even those 52 payments were not forwarded as they came into Beyda's hands—instead, Beyda instructed Parts Authority's Larry Schneider to apply payments to multiple customers and pay off the oldest open Coney Island receivables before applying the funds to Parts Authority's post-closing sales.  The sheer scope of Beyda's 50%+ error rate is further evidence of his reckless disregard of any responsibility and duty he had to Parts Authority throughout the entire employment period.

Needless to say, this is precisely the type of misconduct that the faithless servant doctrine seeks to address, and the faithless servant must return all compensation paid to him.  *See, e.g.*, *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 208 (2d Cir. 2003) (faithless servant forfeited shares in non-employer company that were offered as a reward to employee during the period of disloyalty).  In Beyda's case, this means the $175,000 in salary he collected from Parts Authority and the $616,000 in sales commission paid to him through May 31, 2022 (the last full month of his employment).  Moreover, Parts Authority is entitled to recover its fees and expenses paid to forensic accountants and lawyers to investigate, identify, quantify, and recover the funds from Beyda—up to and including this trial, four years after Beyda's termination by Parts Authority.  These fees and expenses are well over $1 million, before interest.  *See, e.g., Salus Capital Partners, LLC v. Moser*, 289 F.Supp.3d 468, 479 (S.D.N.Y. 2018) (awarding fees incurred with an employer's investigation into an employee's misappropriation and personal use of company funds); *see also Synergy Gas Co. v. Sasso*, 853 F.2d 59, 66 (2d Cir. 1988) (affirming award of attorney's fees as compensatory damages

30

"because if [Defendant] had not acted in bad faith, then Brown would have been reinstated more than six years ago and the attorney's fees would not have been incurred.").

## V.    PARTS AUTHORITY IS ENTITLED TO PUNITIVE DAMAGES

Parts Authority is entitled to punitive damages for two separate reasons. *See In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liab. Lit.*, 725 F.3d 65, 127-129 (2d Cir. 2013) ("the standard for conduct warranting an award of punitive damages 'has been variously described but, essentially, it is conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'") (citation omitted); *O'Neill v. Yield House Inc.*, 892 F. Supp. 76, 78 (S.D.N.Y. 1995) (punitive damages are recoverable where the conduct at issue "involves malice, oppression, wanton or reckless disregard of the plaintiff's rights or other circumstances of aggravation.") (citation omitted).

*First*, punitive damages are appropriate here due to Beyda's faithless service and gross violations of his duty of loyalty to Parts Authority—*at a minimum*, the admitted taking of $799,853 in customer cash that Beyda was empowered to control but was required to segregate and remit to Parts Authority, the judicially established intentional deletion of data, and the improper solicitation and hiring of Parts Authority employee Ms. Halls. *See Consol. Edison Co. v. Zebler*, No. 603678/09, 2013 WL 4467291, at *6 (N.Y. Sup. Ct. Aug. 20, 2013) (awarding punitive damages against faithless servant) (citation omitted).

*Second*, punitive damages are appropriate because Beyda converted cash and property belonging to Parts Authority, spoliated evidence in breach of his legal duty to preserve it in June 2022, and engaged in persistent attempts to conceal his misconduct for years thereafter, requiring

31

Parts Authority to expend an enormous amount of time, resources, and fees to conduct forensic accounting (and forensic data recovery), and pursue wasteful discovery and litigation to "prove" to Beyda that he in fact received and kept hundreds of thousands of dollars in customer cash that belonged to Parts Authority.[17]

At a minimum, Parts Authority is entitled to an award equal to its cost of forensic accounting efforts, the fees and expenses incurred in persevering through the "clean review protocol" that Beyda procured under false pretenses in the first place, and the attorneys' fees and expenses incurred in pursuing this action to trial.  This is *at least* $1 million, above and beyond the claw back of all compensation paid to Beyda in salary ($175,000) and commission ($616,000).

Dated: New York, New York
       June 29, 2026

Respectfully submitted,

 /s/ Daniel Gimmel
Daniel Gimmel
Dana M. Susman

KANE KESSLER, P.C.
600 Third Avenue, 35th Floor
New York, New York 10016
Telephone: (212) 541-6222
Facsimile: (212) 245-3009
dgimmel@kanekessler.com
dsusman@kanekessler.com

*Counsel for Plaintiff Parts Authority, LLC*

---

[17] "To prevail on a claim of conversion, a plaintiff must demonstrate that: '1) the property subject to conversion is a specific identifiable thing; 2) plaintiff had ownership, possession, or control over the property before its conversion; and 3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'"  *Singapore Recycle Ctr. Pte Ltd. v. Kad Int'l Mktg., Inc.*, No. 06-CV-4997 (RRM) (RER), 2009 WL 2424333, at *17 (E.D.N.Y. Aug. 6, 2009), *report and recommendation adopted*, 2009 WL 2778003 (Sep. 1, 2009); *see also 4 KZ Inc. v. DimashAli Creative Center, LLP,* No. 2:24-cv-01249-ST, 2025 WL 2696539 at *6 (E.D.N.Y. Sept. 22, 2025) ("factually analogous conversion and breach of contract claims may coexist if Plaintiffs can either: '(i) demonstrate a legal duty separate from the duty to perform under the contract; … or (iii) seek special damages that are caused by the misrepresentations and unrecoverable as contract damages.'") (citation omitted).