**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PARTS AUTHORITY, LLC, | Case No. 23-cv-07656-SDE |
| *Plaintiff*, | |
| v. | **DEFENDANT'S** <br> **PRETRIAL** <br> **MEMORANDUM** |
| DANIEL BEYDA, | |
| *Defendant*. | |

## I.    INTRODUCTION

The indignant tone of Plaintiff's pre-trial memorandum is misplaced and hypocritical. Furthermore, Plaintiff's pre-trial memorandum is replete with inaccurate statements which appear to have no source or basis.

- It was Plaintiff who insisted that its customers send their payments into Mr. Beyda's bank accounts rather than open a bank accounts for customers to send payments into. Alex Buller told Mr. Beyda that the reason that the PA did not want export customer payments to be made directly into PA accounts was because the PA believed that if it started receiving payments from Middle Eastern customers, it would expose the PA to increased regulatory scrutiny.

- The approximately $800,000 that Mr. Beyda accidentally delayed forwarding to PA amounted to approximately 4% of the eighteen million dollars in customer payments that flowed through Mr. Beyda's accounts at PA's insistence.

- Mr. Beyda ran a twenty-million dollar export department for the PA as a one-man operation. Mr. Beyda's delay in forwarding $800,000 to the PA was accidental and was due to Mr. Beyda's limitations as a book-keeper, as well as the PA's refusal to synchronize Mr. Beyda and the PA's accounts receivable systems.

1

- Despite the PA having at least six employees in their accounting department, it was only when the PA hired a top forensic accountant that it was able to identify that Mr. Beyda had failed to forward $800,000 owed to them. And even with a forensic accountant, he initially only identified $712k before issuing a supplemental report which identified a further $87,000.

- Mr. Beyda repaid both of these sums within a few weeks or receiving the expert reports.

- Unlike Mr. Beyda's unintentional delay,  the PA deliberately refused and/or delayed paying Mr. Beyda many millions of dollars which it was contractually obligated to pay him. This includes:

  o The PA's refusal to pay Mr. Beyda three million dollars it was contractually obligated to pay Mr. Beyda pursuant to §2.6 (f) (iii) of the Asset Purchase Agreement (APA). The PA refused to pay Mr. Beyda these funds claiming that §2.6 (f) (iii) of the Asset Purchase Agreement was left in the APA  by mistake. Mr. Beyda was forced to filed a lawsuit in NY Supreme Court (NY County) (565816/2022) to obtain a Court Order directing this payment. Virtually a year ago to this day, the NYS Trial Court Ordered the PA to make this payment to Mr. Beyda, labeling the PA's interpretation of the APA, "outlandish".  *NY Supreme Court (NY County) (565816/2022), NYSCEF 160,*5*.  With interest and legal fees, Mr. Beyda obtained a judgment against the PA for nearly $5,200,000. *NYSCEF 190*. Despite this judgment and despite the Trial Court's ruling that the PA's defense was "outlandish", the PA has still refused to pay a penny of this judgment and has instead posted

bond and filed an appeal despite knowing that its chances of winning the appeal is close to zero.

- o Pursuant to §2.6(b) of the APA, the PA was required to pay Mr. Beyda on a monthly basis beginning on August 1, 2021, a 2% commission based on his monthly export sales. The PA failed to pay these commission payments to Mr. Beyda until ten months later in June 2022. There was no reason or justification for the PA to delay making these monthly payments. It simply ignored its contractual obligation.

- o Pursuant to §2.6(b) of the APA, the PA was required to pay Mr. Beyda three million dollars on August 22, 2021, but instead it deliberately paid Mr. Beyda this payment 33 days later on September 24, 2021. There was no reason or justification for the PA to delay making this payment. It simply ignored its contractual obligation.

**REFUTING NUMEROUS INACCURACIES IN PLAINTIFF'S PRETRIAL MEMORANDUM**

Plaintiff's pre-trial memorandum is replete with numerous statements that are not true and numerous statements that are lacking critical context. However, as the many of these statements have nothing to do with the legal issues before the Court, Defendant will limit its refutations to those issues that are relevant to this case and to those allegations that directly affect Mr. Beyda's credibility.

Plaintiff's pre-trial memorandum (*1) alleges that Mr. Beyda's delay in forwarding $799k to the PA was a clear breach of the employment agreement. Plaintiff does not cite a clause in the employment agreement that Mr. Beyda breached because there is no such clause. Furthermore, even if the employment agreement had contained a clause requiring him to timely forward all customer payments to PA, Mr. Beyda would have substantially complied with this obligation by

timely forwarding all monies that he believed he was supposed to forward, (which amounted to 96% of the funds that flowed through his accounts) and by timely forwarding the remaining 4% once he received a written request for same.

The PA's pre-trial memorandum (*2) alleges (without providing any substantiation) that Mr. Beyda used the $800,000 to help him pay his own business and personal expenses but this is not true. The two subject bank accounts contained the twenty-four million dollars that Mr. Beyda received as the upfront APA payment and always contained more than enough funds to cover all of Mr. Beyda's personal and business expenses without having to rely on any portion of the $799,000 that Mr. Beyda accidentally delayed in forwarding to PA. In fact, the trial testimony will show that during this period, Mr. Beyda donated over two million dollars to charity.

The PA's pre-trial memorandum (*2) also alleges (without providing any substantiation) that Mr. Beyda filled out and deposited 176 money orders into the subject bank accounts. This is also not true and appears to have been alleged out of thin air. Mr. Beyda did not fill out any of those money orders. Those money orders were directly deposited into Mr. Beyda's accounts by a customer without any involvement or knowledge by Mr. Beyda.

The PA's pre-trial memorandum (*3) also alleges (without providing any substantiation) that Mr. Beyda forwarded 42 customer payments but failed to forward 54 payments. Again, this is not true.

The PA's pre-trial memorandum (*3) also continuously, and deliberately alleges that Mr. Beyda "took" money from the PA whereas he did not "take" a penny from the PA. Instead, over Mr. Beyda's repeated objection, the PA insisted that its customers send payments to Mr. Beyda's bank accounts.

4

The PA's pre-trial memorandum (*3) also alleges (without providing any substantiation) that Mr. Beyda refused to cooperate when the PA requested help reconciliating the books. This is not true, and at trial, the Court will be shown several PA internal and external e-mails where the PA noted that Mr. Beyda provided all the documents that it requested in a timely manner.

The PA's pre-trial memorandum (*4) also insinuates that Mr. Beyda deliberately went to his office at 6 a.m., on the final date of his employment so as to do something untoward. As the PA knows, Mr. Beyda was in his office every morning by 6:00 a.m., because his customers were mainly located in the Middle East. which is many hours ahead of EST.

The PA's pre-trial memorandum (*4) also alleges that Mr. Beyda falsely claimed that he did not want to leave without his computer because it contained his personal information. This is only partially true. Mr. Beyda was not required to leave the computer behind because it was his personal computer that he paid for with his own funds, long before the APA. Because it was his personal computer, it was not among the items that the PA acquired ownership of when it purchased Mr. Beyda's business.

The PA's pre-trial memorandum (*4) also alleges that Mr. Beyda hard-deleted approximately 70,000 e-mails. Mr. Beyda has always adamantly denied that he hard deleted a single email. However, the NYS Trial Judge found plaintiff's expert report more credible than Defendant's expert report (by ANKURA), because ANKURA failed to provide specific examples of the e-mails that it maintained had never been deleted. However, because Mr. Beyda knows that he never deleted any e-mails, he recently retained Stacy Eldridge, a former FBI Senior Forensic Examiner to examine two of the mirror images of the subject computer. Ms. Eldridge randomly reviewed 100 of the allegedly deleted emails. As per the attached report, at least 89 of the allegedly deleted e-mails are in fact still present on the subject computer and were never deleted.

5

Furthermore, Ms. Eldrige's report opines that the software that Plaintiff's expert used to search for the e-mails is not a tool used by forensic IT professionals.   Mr. Beyda will file a motion to renew before the NYS Trial Court based on this new evidence but in the interim, Defendant respectfully asserts that the Trial Court's spoliation Decision should not be relied upon as it was based upon factual assertions to the Court by Plaintiff's expert, that are grossly inaccurate.

The PA's  pre-trial memorandum (*14) alleges that Mr. Beyda's counsel sent PA a "baseless Notice of Default", however, on the one issue that has been litigated to completion so far,  the NYS Trial Court ruled that the PA was obligated to pay Mr. Beyda three million dollars (plus legal fees and interest) pursuant to §2.6 (f)(iii) of the APA, and that its failure to do so was based on an "outlandish interpretation of the APA.

The PA's  pre-trial memorandum (*15) alleges that Mr. Beyda tried to sneak his computer out of the PA's offices by claiming it was his laptop. This is not true. Mr. Beyda never claimed that the computer was a laptop.

The PA's  pre-trial memorandum (*15) alleges that the subject computer belonged to the PA pursuant to the APA. Plaintiff is alluding to the fact that the APA provides that when Mr. Beyda sold his auto parts business to the PA, this included all property belonging to the business including computers. However, the computer in question was Mr. Beyda's personal computer that he used for both work and personal matters, that he purchased with personal funds. This computer never belonged to his auto parts business and was therefore never sold to the PA. Mr. Beyda explained this to the PA but despite the fact that this was Mr. Beyda's personal computer that it had no legal right to, the PA refused to let him leave with his computer.

 The PA's  pre-trial memorandum (*15) alleges that Mr. Beyda drove to Manhattan and hand-delivered his computer to the Paul Weiss Law Office. This is not true. A PA employee

6

accompanied Mr. Beyda to Manhattan and insisted that Mr. Beyda could not go up to the Paul Weiss law office but instead had to give the computer to a person standing on the street claiming to work for Paul Weiss. Mr. Beyda was not given a receipt and has no idea what happened to that computer after he was forced to turn it over on the street.

The PA's pre-trial memorandum (*19) alleges that Mr. Beyda "surreptitiously" hired Ms. Halls to perform work for him. This is not true. Mr. Beyda asked Mr. Buller if Ms. Halls could continue doing a few hours of work for him on evenings and weekends and Mr. Buller said this was fine.

The PA's pre-trial memorandum (*21-22) alleges that Mr. Beyda told Mr. Buller that he used foreign bank accounts to deposit some customer payments. Mr. Beyda adamantly denies that such a conversation took place, and as Plaintiff concedes, its non-party subpoenas to various banks did not uncover such foreign bank accounts. Furthermore, this allegation has nothing to do with the issues before the Court and the sole reason Plaintiff has included this in its pre-trial memorandum is to try and improperly prejudice the Court against Mr. Beyda.

The PA's pre-trial memorandum at *22-23 repeats its baseless allegation that Mr. Beyda deposited 176 money orders totaling $165,000. Plaintiff repeats this allegation despite having zero basis to make this claim and despite Mr. Beyda having testified at deposition that these deposits were made by a customer.

The PA's pre-trial memorandum (*23) alleges that Mr. Beyda only returned the additional $87,250 to PA after he was "caught red handed". This is completely false. First, the PA received the relevant documents from PNC Bank in December 2024, yet it took its forensic accounting expert an additional fifteen months to figure out that these documents evidenced an additional $87,000 in funds due to the PA. The reason that Mr. Beyda did not realize this on his own at the

time the deposits were made is because the only documents he had access to, were the monthly bank statements which merely showed that several deposits ranging from ($5,000 to $55,000) were made into the account. Mr. Beyda did not have the underlying deposit slips which the PA received by subpoenaing PNC Bank. As such, Mr. Beyda was not aware that these were deposits made by a PA customer directly into his PNC Bank.

<div align="center">

**ARGUMENT**

</div>

I.     ANY BREACH OF CONTRACT WAS DE MINIMIS AND
<u>DID NOT CAUSE PLAINTIFF ANY DAMAGES</u>

  **A.**   **THE DELAY IN FORWARDING PA MONIES**

Plaintiff alleges that Mr. Beyda breached his employment agreement with the PA because Mr. Beyda was late in forwarding to the PA, $799,000 out of eighteen million dollars that was deposited into his accounts. However, if this constituted a breach of the employment agreement, Plaintiff would have cited a provision in the employment agreement that was breached. Plaintiff does not do so because there is no such provision.  Furthermore, the APA requires the PA to provide notice of any payment deficiencies by Mr. Beyda which it did not do.

Finally, given that Mr. Beyda timely forwarded 96% of the PA's funds that flowed through his accounts and immediately returned the remaining 4% once these funds were identified by the PA's forensic expert, any breach of contract by Mr. Beyda was de minimis and would not entitle the PA to any damages. See, *Frank Felix Assocs. v. Austin Drugs*, 1997 U.S. App. LEXIS 19795, *5 (1997) [2d. Cir. 1997]:

> We also agree that, in light of Austin's payment to Felix of $ 50,000 under the settlement agreement, Austin's return of the high-speed printer, and Austin's request that Felix remove the tape drive at the end of October, Austin's failure to return the tape drive on October 1 was not a material breach.

<div align="center">

8

</div>

Furthermore, as set out in detail in Defendant's motion in limine (*Dkt 94*) at no time prior to its pre-trial memorandum did Plaintiff ever enumerate any damages it allegedly sustained as a result of Defendant's failure to timely forward the $799,000. Plaintiff cannot, on the eve of trial purport to enumerate its damages for the first time.

Furthermore,  even if the Court allows Plaintiff to enumerate its damages for the first time, in its pretrial memorandum, it has not articulated any damages it sustained other than paying its forensic accounting expert. Plaintiff is not entitled to reimbursement of its expert costs absent a contractual provision or statutory authority, neither of which are present here. See, *Crawford Fitting Co. v. J. T. Gibbons, Inc*., 482 U.S. 437, 438,  (1987):

> Absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the $ 30-per-day limitation prescribed in 28 USCS 1821.

### B.    THE ALLEGED EMAIL DELETION

As an initial matter, Mr. Beyda adamantly denies he deleted any e-mails and he recently retained Stacy Eldridge, a former FBI  Senior Forensic Examiner to examine one of the mirror images of the subject computer. Ms. Eldridge randomly reviewed 100 of the allegedly deleted emails and found that at least 89 of these e-mails were never deleted and are still present on the subject computer. Furthermore, Ms. Eldrige's report opines that the software that Plaintiff's expert used to search for the e-mails is not a tool used by forensic IT professionals.   Mr. Beyda will file a motion to renew before the NYS Trial Court based on this new evidence but in the interim, Defendant respectfully asserts that the Trial Court's spoliation Decision should not be relied upon as it was based upon factual assertions to the Court by Plaintiff's expert that were grossly inaccurate.

Regardless, at no time prior to its pre-trial memorandum did Plaintiff ever enumerate any damages it allegedly sustained as a result of Defendant's alleged e-mail deletion. Plaintiff cannot, on the eve of trial purport to enumerate its breach of contract damages for the first time.

Furthermore, Plaintiff is not entitled to attorneys fees and costs incurred in connection with the clean review protocol because the clean review protocol was a compromise agreement both sides agreed to in order to resolve the impasse over the PA's seizure of Mr. Beyda's personal computer.

Plaintiff argues that because the subject computer contains thousands of e-mails that is proof that the computer belonged to the PA, but of course, this is not proof at all. This merely means that he conducted PA work on his personal computer. There is no reason why the PA should be entitled to the costs incurred by the compromise it forced upon Mr. Beyda who simply wanted to take his personal computer home with him.

Furthermore, Plaintiff has never offered any evidence that the clean review protocol costs were incurred as a result of any breach of contract.

Lastly, the employment agreement does not contain an attorneys' fee provision and attorneys fees are not available for breach of contract absent a contractual provision providing for same. See, *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199, 2003 U.S. App. LEXIS 14664, *30-31, [2d Cir. 2003]:

> Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized [**31] by agreement between the parties, statute, or court rule. See Bourne Co. v. MPL Communications, Inc., 751 F. Supp. 55, 57 (S.D.N.Y. 1990); A.G. Ship Maint. Corp. v. Lezak, 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 (1986); Mighty Midgets, Inc. v. Centennial Ins. Co., 47 N.Y.2d 12, 21-22, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979).

## C.  JULIE HALLS

Leaving aside that Mr. Buller gave Mr. Beyda permission to hire Ms. Halls on a part time basis, Plaintiff did not make any allegations regarding Julie Halls until its pre-trial submissions. Plaintiff should not be allowed to make a breach of contract claim based on Mr. Beyda hiring Ms. Halls to work for him on a part time basis because Plaintiff never made any such allegations until it alleged this for the first time in its pre-trial submissions. Furthermore, Plaintiff has never articulated any damages it sustained as a result of Mr. Beyda hiring her. As such, even if the Court allows Plaintiff to add a new breach of contract claim pertaining to Ms. Halls, the claim must fail because Plaintiff has not articulated any damages it sustained.

## II.    PLAINTIFF IS NOT ENTITLED TO ANY DAMAGES ON ITS FAITHLESS SERVANT CLAIM

### A.    THE DELAY IN FOWARDING 4% OF PA's FUNDS WAS UNINTENTIONAL

Plaintiff alleges that Mr. Beyda only turned over 42 out of 94 customer payment he received. This is not alleged in either expert report and is not true. In fact, one of the payments that was deposited into Mr. Beyda's account on behalf of the PA was for $791,000 which represented 99% of the $799,000 Mr. Beyda delayed turning over to the PA. So it is just as true to state that Mr. Beyda timely turned over every single payment that came into his account except for one.

Regardless, Defendant will prove at trial that the delay in forwarding 4% of the PA's monies was unintentional. Intent is a prerequisite for a faithless servant finding. See, *Phansalkar v. Andersen Weinroth & Co., L.P*., 344 F.3d 184, 204 (2d Cir. N.Y., 2004) (discussing the faithless servant standard):

> The record shows that Phansalkar intended for AW not to receive certain income and benefits, and to that end he not only withheld information from AW but also declined the offer to AW of a Sync Board seat. The record also shows that Phansalkar intended to keep at least some of these benefits for himself -- because he **knowingly** received and retained them without ever disclosing them to AW.  In taking these actions, Phansalkar disregarded his

affirmative duty to act in his employer's best interests. See Maritime Fish Prods., 474 N.Y.S.2d at 286. We find that Phansalkar **acted <u>with sufficient knowledge of his omissions, and their consequences</u>**, to warrant forfeiture under New York law. (emphasis added)

And see, *Carco Group, Inc. v. Maconachy*, 383 Fed. Appx. 73, 76-77, (2d Cir. 2010):

Here, the district court found that under either standard, Maconachy was a faithless servant because of his self-dealing and **<u>deception</u>** in removing the name of a family member from employee records transmitted on a weekly basis to O'Neill.

We see no error in this determination. The **deception** in this case is plain…(emphasis added)

Because the delay in forwarding 4% of the funds was unintentional, it cannot form the basis of a faithless servant claim.

## B.  THE ALLEGED E-MAIL DELETION DOES NOT WARRANT A FINDING OF FAITHLESS SERVANT

As set forth above, the annexed expert report by former FBI forensic examiner Stacy Eldridge, proves that Trial Court's spoliation finding was based on a faulty expert report submitted by Plaintiff based on amateur software that is not accepted among the professional IT forensic examiners. Defendant will file a motion to renew the spoliation hearing based on this new expert report from Ms. Eldridge. In the interim, it is respectfully submitted that this Court cannot rely on the Trial Court's spoliation ruling as it was based on a factually inaccurate expert report.

However, even if this Court does rely on the spoliation finding, Plaintiff still cannot meet the faithless servant standard because as Plaintiff concedes in its pre-trial memorandum, in order to find that an employee was a faithless servant, the Plaintiff must provide evidence that the employee's disloyalty "permeated the employee's service". *Dkt 102, \*28, fn 16*. Here, however, the alleged e-mail deletion took place after Mr. Beyda was terminated on his final morning at work. *Dkt 102, \*4.* Committing a disloyal act on the final morning of employment cannot constitute evidence of disloyalty that "permeated the employee's service".

12

However, if despite the aforementioned, the Court finds that Mr. Beyda was a faithless servant, at best Plaintiff is entitled to recoup the salary it paid him for his final day of employment as damages for a faithless servant are limited to recouping the compensation paid from the date of the alleged act of disloyalty.  See *Miller v. Levi & Korsinsky*, LLP, 2021 U.S. Dist. LEXIS 27448, *12, 2021 WL 535599 (2021) [S.D.N.Y. 2021]:

> A person who is found to be faithless in h[er] performance of services is generally liable for all compensation from the date of the breach

And see, *Carco Group, Inc. v. Maconachy*, 383 Fed. Appx. 73, 76, 2010 U.S. App. LEXIS 13574, *8 [2d Cir. 2010].

A second reason Plaintiff is not entitled to any damages on its faithless servant claim is because, as set forth in detail in Defendant's motion in limine (Dkt 94),  it failed to enumerate such damages prior to its pre-trial submissions.

## III.    PLAINTIFF IS NOT ENTITLED TO ANY PUNITIVE DAMAGES

Plaintiff is not entitled to any punitive damages because, as set forth in greater detail in Defendant's motion in limine, (*Dkt 92*), until the eve of trial, the only claim Plaintiff made for punitive damages is with respect to its conversion claim.  Plaintiff does not seek punitive damages for any other cause of action in its Complaint, Rule 26 Disclosure or Interrogatory response.  As Plaintiff's only claim for punitive damages is on its conversion claim which is not actionable, (for the reasons set forth in Dkt 92), Plaintiff should be precluded from making any reference to punitive damages at trial.

See, *Sohnen v. Charter Commc'ns, Inc.*, 761 F. Supp. 3d 556, 572-573 (E.D.N.Y. 2025):

> As an initial matter, Defendant is permitted to move to dismiss Plaintiff's punitive damages claim as part of its motion in limine, as such a request—if granted—would narrow the issues to be presented by the jury. See, e.g., Lovejoy-**Wilson** v. Noco Motor Fuels, Inc., 242 F. Supp. 2d 236, 244

(W.D.N.Y. 2003) (finding a "request to dismiss the punitive damages claim may properly be brought as a pretrial motion in limine" and collecting case where Courts "have entertained such motions on the eve of trial as procedural [**31] devices designed to narrow the issues to be presented to the jury"); Pepe v. Maklansky, 67 F.Supp.2d 186, 187-88 (S.D.N.Y.1999) (denying motion in limine [*573] seeking order dismissing employee's punitive damages claim in civil assault action, finding it "well settled that the determination whether to award punitive damages lies in the discretion of the trier of the facts."); Baxter Diagnostics, 1998 U.S. Dist. LEXIS 15093, 1998 WL 665138, at *1-2 (granting defendant's motion in limine dismissing claim for punitive damages in contract action).

## CONCLUSION

The Trial Court should not grant Plaintiff an adverse inference as to Defendant's credibility and indeed should not rely on the NYS Trial Court's spoliation ruling at all, because as shown in the annexed expert report, the expert report that the NYS Trial Court's spoliation ruling is based on falsely claimed to have proven that Mr. Beyda deleted thousands of emails, where in fact, there is demonstrable proof that these emails still exist.  Regardless, even if the spoliation ruling is relied upon, this alleged wrong doing took place on the final day of employment and is therefore irrelevant to a claim of faithless servant.

The vast majority of Plaintiff's liability and damages claims as described above and in Defendant's motions in limine should be precluded because they were alleged for the first time in Plaintiff's pre-trial submissions.

Defendant's trial testimony will prove that the delay in forwarding 4% of the PA's money was accidental and that the hiring of Julie Halls on a part time basis was consensual. Therefore, neither of these allegations can form the basis for a faithless servant claim.

14

July 7, 2026

<div style="margin-left:40%">

s/ <u>Gerry Grunsfeld</u>
Lazar Grunsfeld Elnadav LLP
Attorneys for Defendant

</div>